UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| V.W.,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>　　　　　　Defendant. | Case No. 18-cv-07297-JCS<br><br>**ORDER GRANTING PLAINTIFF'S<br>MOTION FOR SUMMARY<br>JUDGMENT, DENYING<br>DEFENDANT'S MOTIONS FOR<br>SUMMARY JUDGMENT AND<br>REMANDING FOR FURTHER<br>PROCEEDINGS**<br><br>Re: Dkt. Nos. 16, 19 |

## I.    INTRODUCTION

Plaintiff V.W.[1] brings this action appealing the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner")[2] denying V.W.'s application for disability benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381, *et seq.* The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5. For the reasons discussed below, V.W.'s motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings consistent with this opinion.[3]

## II.    BACKGROUND

### A.    Education, Employment and Living Situation

V.W. is a fifty-two-year-old woman with a seventh-grade education. Administrative

---

[1] Because opinions by the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by her initials. This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).
[2] Andrew Saul was confirmed as Commissioner while this action was pending and is therefore substituted as the defendant as a matter of law. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).
[3] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

Record ("AR") at 88. V.W. described herself as an "ADHD kid" who her mother "couldn't handle." *Id*. at 345. Her mother was addicted to heroin when V.W. was born. *Id*. at 371. V.W. reported being sexually abused by friends of her brother as a child, and verbally and physically abused by her mother. *Id*. at 345. Her father died of a heart attack when she was 13. *Id*. at 483. V.W. cherishes her memories of her father and calls him her "guardian angel." *Id*. at 345. At age 13, V.W. became a "ward of the state" and entered foster care. *Id*. She ran away from her foster home two years later at age 15. *Id*.

In her initial disability report, V.W. checked a box indicating she "had only one job in the last 15 years" before the alleged onset date of her disability: she spent one month as a retail clerk at a clothing store in 2011, where she worked four hours per day one day per week. *Id*. at 232. She told Dr. Cathy Wilkie, her psychologist, that she also held jobs at 7-11 and McDonalds. *Id*. at 345.

Since at least February 10, 2016, V.W. has been homeless and living in her car or a shelter. *See id*. at 206, 297.

**B.      Summary of Medical Treatment**

On February 10, 2016, V.W. was seen by Marion Jordan, PA, for ear pain, cough and congestion. *Id*. at 297. V.W. told PA Jordan that she had been "clean and sober" as to meth and alcohol for forty-seven days, although she still used marijuana "for anxiety symptoms." *Id*. Jordan also noted that V.W. was "lying on the table moaning which she stopped as soon as [Jordan] came in the room," that V.W.'s speech was "rapid," and that she used "excessive hand gestures." *Id*. She described V.W.'s affect as "[l]abile" and noted that V.W.'s speech was "[t]angential." *Id*. V.W. reportedly "discussed . . . how doctors poison patients with medications." *Id*.

V.W. saw Dr. Thomas Gant for her annual physical exam on December 1, 2016. *Id*. at 265. Dr. Gant noted that V.W. had a history of drug abuse but had been sober for five months, abstaining from methamphetamine ("meth"). *Id*.

V.W. was seen by Eugene Santillano, M.D., on December 14, 2016. *Id*. at 268. Dr. Santillano noted that V.W.'s primary diagnosis was "chronic hepatitis C" and that her lab results

were positive for hepatitis C and negative for hepatitis A and B. *Id*. V.W. saw Dr. Santillano again on March 14, 2017 for a follow-up. *Id*. at 273. Dr. Santillano discussed quitting smoking with V.W. but she told him she wasn't ready to quit and was "[n]ot interested in pills." *Id*.

A treatment note by Dr. Judith Kelley dated May 10, 2017 adds, "[m]oderate episode of recurrent major depressive disorder" (MDD), posttraumatic stress disorder (PTSD), and anxiety to V.W.'s problem list. *Id*. at 285. The note states that V.W. had taken the antidepressants Paxil and Trazadone but stopped taking them because they made her "feel like a zombie." *Id*. V.W. further reported depression, anxiety, panic attacks, and inability to work "because she is unable to focus and concentrate these days." *Id*. An addendum by Dr. Santillano dated December 14, 2017 also noted that V.W.'s substance use was "in remission" and that she had been clean since August 12, 2016. *Id*. On June 19, 2017, Dr. Santillano added "anxiety" to V.W.'s problem list. *Id*. at 277.

At her first visit with Dr. Willkie, on May 12, 2017, V.W. explained that she was often "[s]ad and tearful" and that she was "constantly trying to stay away from everyone." *Id*. at 345. Dr. Willkie also noted V.W.'s "[c]hildlike demeanor," which she found "quite notable given patient's age." *Id*. at 346. She further noted that V.W. had a "child-like tone of voice," although her rate of speaking was normal and there was no evidence of delusions. *Id*. V.W. reported her mood as being "kinda sad- happy," and she had a tearful affect. *Id*. Dr. Willkie's diagnostic impression was "PTSD; MDD; [Rule-Out] Panic Disorder." *Id*. Her diagnosis for the visit was "Posttraumatic stress disorder." *Id*.

V.W. felt "about the same" two weeks later at a visit with psychiatrist Brinda Krishnan, M.D., on May 23, 2017. *Id*. at 348. Dr. Krishnan noted that V.W.'s mood and anxiety were five out of ten (on a scale where ten was the worst), while she "report[ed] 5 to 6 panic attacks in the last week." *Id*. V.W. also reported sleeping only four hours a night. *Id*. Dr. Krishnan started V.W. on 5 mg. of Lexapro and 25 mg. of hydroxyzine to help her sleep. *Id*. at 348–49.

According to a treatment note from a May 30, 2017 visit with Dr. Willkie, V.W. had a "rocky start" with the hydroxyzine because it made her "very sedated" so her doctor told her to cut the pill in half. *Id*. at 344. V.W. "shared her fears of trusting almost anyone around her" and told Dr. Wilkie she feared that her hepatitis C medication was being unfairly kept from her. *Id*. Dr.

Willkie assessed her as having PTSD.  *Id.*

On June 13, 2017, V.W. told Dr. Krishnan that she was feeling better, that her panic attacks had decreased, and that her sleep medication was helpful.  *Id.* at 343.  She told him that she had relapsed for two days on meth a week before after ten months of sobriety "because she felt tired."  *Id.*  Still, she reported feeling safer around her peers and taking walks for exercise.  *Id.*  At her June 27, 2017 appointment, V.W. told Dr. Krishnan about her roommates' "witchcraft," which was "threatening but not scary," and she noted feeling safer around other people.  *Id.* at 334.

On July 20, 2017, V.W. reported to Dr. Krishnan that she was very anxious but she denied being depressed.  *Id.* at 333. She reported that her sleep was being disturbed by dreams.  *Id.*  Dr. Krishnan noted that for V.W., "being around other people is stressful. . . . Feels like people are going to take advantage of her."  *Id.*  V.W. also expressed concern "about the witchcraft going on in my house."  *Id.*  Dr. Krishnan increased V.W.'s Lexapro to 15mg. and continued her hydroxyzine.  *Id.*

On August 2, 2017, Dr. Kelley wrote that V.W. was "struggling with her anxiety and at night has difficulties with sleeping."  *Id.* at 387.  She described V.W. as an "alert . . . but anxious, restless woman."  *Id.*  She noted that Dr. Krishnan was seeing V.W. regularly and adjusting her medications.  *Id.*

At her visit with Dr. Krishnan on August 18, 2017, he noted that her mood had improved and that she was "[g]etting along better with smaller groups and peers."  *Id.* at 390.  However, she reported that she still was sleeping only four hours a night.  *Id.*

V.W. saw Dr. Willkie on September 6, 2017 for anxiety.  *Id.* at 392.  Dr. Wilkie noted that V.W. was "very restless/agitated."  *Id.*  V.W.  reported that she had "a roommate that reminds her of her when she was younger whose behavior triggers/jacks her up with co-dependent rescuing, and that she has been told by staff to 'develop some boundaries.'"  *Id.*  She also reported that a security guard had "made a pass at her, which angered her, and she came back assertively."  *Id.*  V.W. told Dr. Wilkie that leaving the shelter and going for walks alone, away from other people, helped her cope with some of the anxiety.  *Id.*  Dr. Willkie noted that V.W. used humor as a defense against her anxiety, depression, and "external triggers."  *Id.*  V.W. reported being sober

for one year.  *Id.*

On September 19, 2017, V.W. was seen by Dr. Krishnan.  *Id.* at 394.  She told him she had been "trembling for the past 3 days" and had "been under stress" due to people coming and going from the shelter where she lived and social anxiety.  *Id.*  Dr. Krishnan observed that V.W.'s mood was "better, more stable" nonetheless.  *Id.*  V.W. reported that she felt safe at the shelter and with her caseworker, Tia.  *Id.*  Dr. Krishnan noted that V.W. had maintained her sobriety for over a year and attended Alcoholics Anonymous meetings regularly.  *Id.*

On March 19, 2018, V.W. saw Dr. Krishnan for the first time since September 2017.  *Id.* at 628.  She told him that she had not been taking her medication.  *Id.*  She also reported that her sleep was "poor" and that she was experiencing "some anxiety."  *Id.*  She reported that she had maintained her sobriety for two years.  *Id.*  Dr. Krishnan restarted V.W. on Lexapro and hydroxyzine. *Id.*

On March 28, 2018, V.W. saw Dr. Willkie after not being in therapy "for a number of months." *Id.* at 626.  Dr. Wilkie noted that V.W. felt "very anxious" and was "not going to bed until around 4 or 5 in the morning."  *Id.*  V.W.  reported that her medication was not working, but admitted that she hadn't taken it for "almost a week" because of medication changes from Dr. Krishnan.  *Id.*    According to Dr. Wilkie, Dr. Krishnan had added Zoloft to V.W.'s medications.[4] *Id.*  While adjusting to the new medication, V.W. reported that she was distracting herself from her symptoms by cleaning, walking, and starting to ride her bike.  *Id.*  She also attended AA meetings daily.  *Id.*

V.W. saw Dr. Willkie again on May 18, 2018.  *Id.* at 624.  V.W. reported that she had been staying up at night "watching outside or checking doors and locks" to protect herself and the other people in the shelter from the homeless people who she reported were outside.  *Id.* at 624.  V.W. also "describe[d] being distracted by listening to what is going on around her even when someone is talking to her, and that people notice and chide her for not 'paying attention to yourself.'  She

_____

[4] Dr. Krishnan's notes from the March 19, 2018 visit do not reflect that a prescription for Zoloft was added to V.W.'s medications.  It is unclear when this additional medication was prescribed or if Dr. Wilkie was mistaken.

says she doesn't know how to stop this." *Id*. She also reported "restless leg syndrome (not in those words)." *Id*. Dr. Willkie noted that V.W. had missed appointments with Dr. Krishnan. *Id*. While Dr. Willkie observed V.W.'s mood to be "generally euthymic," she also noted that V.W. was "[s]lightly hypomanic" and "display[ed] OCD checking behaviors versus PTSD hypervigilance." *Id*.

On May 21, 2018, Dr. Krishnan stated in his treatment note that V.W.'s mood was "stable," but her sleep problem was not improving: she reported sleeping a maximum of three hours and took naps during the day. *Id*. at 622. V.W. was still afraid of social situations, was "easily triggered" and reported an anxiety level of seven out of ten. *Id*. V.W. was still sober and was "running" an AA meeting. *Id*. She reported that her mood was "up and down" depending on her sleep schedule. *Id*. Dr. Krishnan started V.W. on trazodone. *Id*.

On June 21, 2018, V.W. told Dr. Krishnan that the trazodone was helping with her sleep and that her mood was "up and down." *Id*. at 608. She also told Dr. Kelley that she was "more depressed than anxious," and was specifically dealing with her feelings around never having children. *Id*. At home, she reported an "altercation" with another resident who had since relocated. *Id*. V.W. told Dr. Krishnan that she was "[c]omitted to sobriety, engaged in AA," and had been sober since August of 2016. *Id*. While V.W.'s demeanor during the visit was "conversational," she spoke rapidly and was "interruptible." *Id*. V.W. described herself as "bewitched and a goddess," and Dr. Kelley observed that she continued to exhibit "[q]uasi psychotic thought process and mood lability." *Id*. Dr. Kelley thought this "[m]ay be related to PTSD or cultural belief system." *Id*.

At her June 15, 2018 visit with Dr. Willkie, V.W. reported that she had an abusive boyfriend also living at the shelter, and that she was trying to end the relationship. *Id*. at 620. Dr. Willkie wrote that V.W. felt "triggered by the behaviors of other residents and perceived instability in management." *Id*. At the appointment, Dr. Willkie observed that V.W.'s mood was "[a]nxious," that her affect was "congruent," and that she was "[h]ypomanic/hyper verbal." *Id*. Dr. Willkie also noted that V.W. had missed an appointment with Dr. Krishnan. *Id*.

### C.  Dr. Wilkie's Reports

Dr. Willkie completed a Behavioral Health Report on July 5, 2017.  *Id*. at 601-602.  She checked boxes indicating that V.W. was not significantly limited in her ability to "ask simple questions or request assistance," that V.W. was moderately limited in her ability to "carry out very short and simple instructions," "make simple work-related decisions," "accept instructions and respond appropriately to criticism from supervisors," "get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes," "respond appropriately to changes in routine," and "be aware of normal hazards and take appropriate precautions."  *Id*.  In addition, Dr. Willkie checked boxes indicating that V.W. was markedly limited in her ability to "remember work-like procedures," "understand and remember very short and simple instructions," "maintain attention for extended periods – two hour segments or more," "maintain regular attendance, and be punctual within customary tolerances," "sustain ordinary routine without special supervision," "work in coordination with or proximity to others without being unduly distracted by them," and "complete a normal workday and work-week without interruptions from psychologically based symptoms and to perform [at a] consistent pace without an unreasonable number and length of rest periods."  *Id*. at 601.  Dr. Willkie wrote that V.W.'s limitations stemmed from her diagnosis of PTSD.  *Id*. at 602.

In Dr. Willkie's opinion, V.W. could not work because of her mental health conditions.  *Id*.  She indicated that while V.W.'s condition had persisted for more than a year, it was temporary and would likely improve in eleven months.  *Id*.  Dr. Willkie also checked a box indicating that she did not have enough information to assess whether V.W.'s condition prevented her from engaging in substantial gainful employment.  *Id*.  She further answered "N/A" when asked if V.W. had "work restrictions related to [her] mental health."  *Id*.  Finally, she reported that Willkie had been sober for around ten months and that she did not have a current problem with drug or alcohol abuse.  *Id*.

Dr. Wilkie subsequently submitted an updated Behavioral Health Report based on her examination of V.W. on June 15, 2018.  AR 604-695.  Dr. Wilkie again listed V.W.'s diagnosis as PTSD with an onset date of May 12, 2017.  *Id*. at 604.  Dr. Wilkie found that V.W. was moderately limited in her ability to: "carry out very short and simple instructions" and "complete a

normal workday and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id* She found that V.W. was markedly impaired in her ability to: "remember work-like procedures;" "understand and remember very short and simple instructions;" "maintain attention for extended periods – two hour segments or more;" "maintain regular attendance, and be punctual within customary tolerances;" "sustain an ordinary routine without special supervision;" "work in coordination with or proximity to others without being unduly distracted by them;" "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" "ask simple questions or request assistance;" "accept instruction and respond appropriately to criticism from supervisors;" "get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes;" "respond appropriately to changes in a routine;" and "be aware of normal hazards and take appropriate precautions." *Id.* 604-605. Dr. Wilkie noted that V.W. "had severe post traumatic stress disorder with frequent triggers which impair[ed] functioning." AR 605.

In this report, Dr. Wilkie modified her previous conclusion that V.W.'s inability to work due to her condition was temporary, instead checking the box for "persistent." *Id.* In addition, instead of checking the box for insufficient information in response to the question whether V.W.'s condition will "prevent engagement in substantial gainful activity," Dr. Wilkie checked "yes." *Id.* Dr. Wilkie checked "no" for alcoholism and drug abuse. *Id.*

### D. V.W.'s Adult Function Report

V.W. completed a Function Report - Adult on July 17, 2017. *Id.* at 208–21. She stated that she was living in a homeless shelter with several other people. *Id.* at 208. In response to a question asking how her conditions limited her ability to work, she stated that it was hard for her to understand and stay focused. *Id.* She also described her early life, including abuse from her mother and others. *Id.* She checked boxes indicating that she did not care for any other people or animals. *Id.* at 209. She reported that she spent her days walking around town and, when she returned to the shelter, "try[ing] to stay away from others." *Id.* She also wrote that her condition

interfered with her sleep because she experienced nightmares about her "Daddy," who she felt was an angel, and other "bad" angels. *Id*. V.W. did not report any problems with her personal care.

V.W. indicated that she did not need help taking medications and stated that she did not like the way her past medications had made her feel. *Id*. at 210. V.W. said she liked to cook when doing so was not stressful. *Id*. However, she did not cook her own meals because the shelter where she lived provided them. *Id*. With regard to housework, she was able to do the chores assigned to her by the shelter and keep her own room and space clean, although she did not iron. *Id*.

V.W. reported that she went outside to get away from other people. *Id*. at 211. She was able to walk, ride a bicycle, and take public transportation. *Id*. Whether she went out alone depended on how her "tummy" felt. *Id*. She did not drive because her license expired. *Id*. She shopped in stores for food, clothing, and whatever "stuff that needs to be shop[ped] for." *Id*. V.W. stated that she tried to finish her shopping quickly to avoid encountering other people in stores. *Id*. Her only hobby was walking, although she had enjoyed riding horses before her father died. *Id*. at 213. Since her illness began, V.W. said she was focused on "[j]ust staying alive." *Id*.

Socially, V.W. checked "yes" in response to a question asking if she spent time with others, stating that she spent time at the shelter, but she wrote that it is "really hard" to be around others and that she is alone "most of the time." *Id*. at 213. She wrote that it was difficult to stay focused when angels were trying to "take [her] the wrong path for [her] life." *Id*. V.W. also wrote that she did not participate in social activities because "they stress [her] out." *Id*. at 215. She checked boxes indicating that her condition affected her ability to sit, talk, see, remember things, complete tasks, understand things, follow instructions, use her hands, and get along with others. *Id*. When asked how long she could pay attention, V.W. responded "[n]ot at all." *Id*. She also reported having trouble following spoken instructions, *id*., and trouble handling stress and changes in routine, *id*. at 217. V.W. attached several additional pages to her function report that described her love for her deceased father and her belief that he was an angel in her life. *Id*. at 212, 214, 216, 218, 220.

### E.    Third Party Function Report by Veronica Whiteley

Veronica Whiteley, a friend of V.W.'s who lived with her at the shelter, completed a third-party function report on July 17, 2017. *Id*. at 222–229. Whiteley wrote:

> [V.W.] has problems focesing [sic] for any length of time. Her mood is always elevated (up) and she can't slow down, to the point that people think she's on drugs, when she isn't. . . . She is constintly [sic] on the go, moving around, cleaning, running errands. She is in non-stop "do" mode.

*Id*. She opined that V.W.'s condition impacted her ability to focus and led her to engage in repetitive behavior, as well as affecting her sleep: "she is up and down all night." *Id*. at 223. While V.W. did not need help or reminders to take her medication, Whiteley noted that "she is easily distracted." *Id*. at 224. Whiteley wrote that it took V.W. longer to do chores and that she needed to be reminded to complete them due to her attention difficulties. *Id*. Whiteley echoed V.W.'s earlier claim that "she likes to shop quickly, due to being overwhelmed by other people." *Id*. at 225. Whiteley also noted that V.W. could not correctly count change. *Id*.

Addressing V.W.'s hobbies, Whiteley reported that V.W. took daily walks and visited the beach "at least once a week." *Id*. at 226. However, she observed that V.W. "is easily distracted and overwhelmed, by people and situations." *Id*. at 226. Whiteley wrote that socially, V.W. "gets easily overwhelmed and can't be around other people very long." *Id*. According to Whiteley, V.W. went to church and appointments, but wanted to finish those activities quickly because they overwhelmed her, causing her to isolate herself. *Id*. at 227.

Whiteley checked boxes indicating that V.W. had trouble with standing, sitting, talking, seeing, remembering, completing tasks, concentrating, understanding, and following instructions. *Id*. Whiteley attributed V.W.'s memory problems to "multiple brain injuries." *Id*. In response to a question asking how long V.W. could pay attention, Whiteley replied: "she can't focus for any length of time." *Id*. at 227. According to Whiteley, this lack of focus impaired V.W.'s ability to follow both written and spoken instructions. *Id*. Whiteley also reported that V.W. "has a short temper and gets frustrated quickly," and that it was difficult for her to adapt to changes in routine. *Id*. at 228.

**F.**    **Record Review by Non-Examining State Agency Doctors**

As part of her initial application for disability benefits, V.W.'s record was reviewed by Dr. Meenakshi, M.D., on July 28, 2017. *Id.* at 82. Dr. Meenakshi opined that V.W. was moderately limited in all four of the "paragraph B" criteria: understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. *Id.* Dr. Meenakshi found that V.W.'s claims were partially consistent with the evidence in the record:

> The subjective claims in file are not fully supported by the objective evidence. There is no severe physical impairment. And even though clmnt endorses some strange beliefs, and has childlike behavior, recent [Mental Status Exam] is [Within Normal Limits], and clmnt is responding well to Rx. Therefore clmnt is overall partially consistent.

*Id.* at 83. While Dr. Meenakshi found that V.W.'s ability to understand and remember detailed instructions was moderately limited, he opined that she was capable of following simple instructions. *Id.* at 84. Dr. Meenakshi found that V.W. had moderate limitations in her ability to "carry out detailed instructions," "maintain attention and concentration for extended periods," "work in coordination with or in proximity to others without being distracted by them," and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* Dr. Meenakshi also found V.W. had moderate limitations in her ability to "interact appropriately with the general public" and "accept instructions and respond appropriately to criticism from supervisors." *Id.* at 84–85. Dr. Meenakshi noted that V.W. was "isolative and paranoid." *Id.* at 85. Finally, Dr. Meenakshi found that V.W. was moderately limited in her "ability to respond appropriately to changes in the work setting." *Id.*

As part of that same initial application, Dr. G. Williams evaluated V.W.'s vocational factors. *Id.* at 86–87. Dr. Williams found that V.W. had no relevant past work and would be limited to unskilled work. *Id.* Dr. Williams listed three occupations V.W. could possibly perform: an "Addresser" (DOT 209.587-010), a nut sorter (DOT 521.687-086), and a cuff folder (DOT 685.68-014). *Id.* He found V.W. "Not Disabled." *Id.* at 87.

On November 29, 2017, Dr. Joshua Schwartz, Ph.D., reviewed V.W.'s file as part of her

request for reconsideration. *Id.* at 95. He agreed that V.W. had moderate limitations in all four of the paragraph B criteria and agreed with Dr. Meenakshi's assessments of V.W.'s mental residual functional capacity. *Id.* at 96–98. He found that V.W. could understand and remember simple instructions; carry out simple instructions, maintain concentration and attention over extended periods for simple tasks; sustain appropriate interaction with coworkers and supervisors; and appropriately respond to most changes in a work setting. *Id.* at 98–99. He added that V.W. "requires limited interaction with the public." *Id.* at 98-99. He found V.W. "Not Disabled." *Id.* at 100.

## G.    Summary of Administrative Proceedings

V.W. filed her initial application for disability benefits on June 28, 2017. *Id.* at 170. Her initial application was rejected on July 28, 2017. *Id.* at 104-109. Her request for reconsideration was denied on November 30, 2017. She requested a hearing on the denial and a hearing before an administrative law judge ("ALJ") and a hearing was held on July 13, 2018. *Id.* at 57. The ALJ issued a decision denying V.W.'s application for disability on July 25, 2018. *Id.* at 12-27. V.W. requested review of the ALJ's decision by the Appeals Council, which was denied on October 2, 2018, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1-6.

## H.    The Administrative Hearing

ALJ Thomas Gaye presided over the administrative hearing. *Id.* at 57. V.W. was represented by attorney Robert Taren. *Id.* Also in attendance was Vocational Expert ("VE") Thomas Lenvill. *Id.* The ALJ expressed skepticism about V.W.'s claim from the outset and took only limited testimony from V.W. *See id.* at 58. The ALJ first questioned V.W. about her sobriety. *Id.* She testified that she had been sober since August 13, 2016 following a DUI and subsequent residential treatment. *Id.* at 58–59. The ALJ asked her about evidence in the record that she had used drugs in June 2017, pointing to Exhibits 5F and 6F (AR at 403–521).[5] *Id.* at 59. V.W. explained that she "relapsed on marijuana" in December of 2016. *Id.* V.W.'s attorney asked

---

[5] The ALJ may have been referring to Dr. Krishnan's treatment notes from a June 13, 2017 visit noting that she had relapsed on meth for two days the week before. *See* AR 408-409. He did not follow up, however, when V.W. testified that she had relapsed on marijuana in December 2016 but did not mention a meth relapse (or any other relapse) in 2017.

12

1    the ALJ to change V.W.'s onset date to June 28, 2017 to correspond with the medical record

2    evidence. *Id*. at 60.

3    V.W. testified that she was fifty years old at the time of the hearing and that she had

4    completed the seventh grade. *Id*. at 61. When asked about her work history, V.W. testified that

5    she had not worked in the past fifteen years. *Id*. at 62. V.W.'s attorney asked about her

6    employment at Kohl's department store; V.W. responded that she worked for "[a]bout two weeks"

7    as a seasonal employee "[p]utting clothes away." *Id*.

8    V.W. testified that she had used alcohol and meth in the past but that she had not used

9    either since August 13, 2016, when she entered residential treatment in Santa Cruz for two

10   months. *Id*. at 63. While there, she began seeing psychiatrist Dr. Krishnan, who prescribed

11   medication, and psychologist Dr. Willkie. *Id*. at 64–65. V.W. also testified that she went to

12   Alcoholics Anonymous meetings weekly and that she was not longer using marijuana, which was

13   the drug on which she said she relapsed in December 2016. *Id*.

14   V.W.'s attorney asked her about the symptoms caused by her anxiety, which she described

15   as "mood swings." *Id*. at 66. She also explained that she isolated herself from other people to

16   avoid hurting them or being hurt by them. *Id*. V.W. described her panic disorder, which resulted

17   in her having sweaty palms, nervousness, and difficulty breathing. *Id*. She confirmed that she'd

18   been asked to leave housing situations "because [of her] anger issues." *Id*. With regard to her

19   sleep disturbances, V.W. testified that she was taking trazodone to "be on a pattern." *Id*. at 67.

20   She testified that she was still smoking but was "trying to quit." *Id*. She testified that she was

21   homeless and had been receiving care from Santa Cruz Mental Health Center for the past two

22   years. *Id*. When asked whether she returned to the treatment center "just to check in," V.W.

23   testified that she was serving as a "shadow peer," or a sober person who supported others in the

24   earlier stages of their recovery. *Id*. at 68.

25   V.W.'s attorney then asked V.W. to describe her daily activities. *Id*. at 68. She testified

26   that she "walk[ed] a lot and stay[ed] away from people." *Id*. She isolated, she explained, because

27   she felt people were "watching [her] or looking at [her] with expectations behind it." *Id*. She

28   thought those expectations were of a sexual nature. *Id*. When her lawyer asked if she had been

sexually abused, she replied "Yes." *Id*. She testified that it was equally difficult for her to be around both men and women because she had been raped by both in the past. *Id*.

Finally, V.W. responded to questions by her attorney about her memory and ability to concentrate. *Id*. at 69. She described her concentration as "worse than a toddler" and said that it was difficult for her to remember things. *Id*. For example, she noted that she "went back to get [her] ID three times and [she] forgot it." *Id*.

The ALJ then questioned Thomas Linvill, the VE, with the following hypothetical:

> Obviously the question would be entry level work. It's clear that there was no past relevant work. So, consider then her age, education level and that lack of work would limit her to simple, repetitive tasks, no public contact. Only occasional contact with coworkers and supervisors. Is there any work for such a person?

*Id*. at 69–70. The VE testified that there would be: such a person could work as a janitor, a job with medium work with an SVP of 2 and around 300,000 jobs in the national economy, a salvage laborer, a job with an SVP of 2 and around 46,000 jobs in the national economy, or a hand packager, a job where 83% of jobs require an SVP of 1 or 2 and around 382,000 jobs in the national economy. *Id*. at 70.

V.W.'s attorney offered a second hypothetical:

> Taking consideration the Judge's instructions for your hypothetical #1, if you added on using Exhibit 8F [AR at 601–02] for this, someone who's markedly limited in remembering -- markedly limited in her ability to remember work-like procedures and markedly limited understanding and remember very short and simple instructions. And someone who is markedly limited in ability to maintain attention for extended periods of two-hour sentence or more. And markedly limited to maintain regular attendance and punctuality with customary tolerances. . . . Let's say markedly is more than 20% of the time. . . . Markedly limited ability to complete a normal workday, workweek without interruptions. And unable to perform consistent pace without unreasonable number of rest periods at least 20% of the day. Would such a person be able to do any of the jobs that you just mentioned?

*Id*. at 70–71. The VE replied: "No. I think this person would have a difficult time maintaining competitive productivity." *Id*. at 71. V.W.'s attorney clarified that the jobs the VE listed in response to the ALJ's first hypothetical would require occasional contact with supervisors and peers. *Id*. at 71–72. The VE testified that he "couldn't offer those jobs" he had listed earlier. *Id*.

14

at 72.

Finally, V.W.'s attorney stated that V.W. had not used alcohol or meth for a year and that her marijuana use "does not seem to be an issue for the doctors." *Id*. at 73. He concluded by noting that V.W. "had lifelong problems with or without . . . drugs." *Id*.

## I.    Regulatory Framework for Determining Disability

### 1.    Five-Step Analysis

When a claimant alleges a disability and applies to receive Social Security benefits, the ALJ evaluates the claim using a sequential five step process. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determines whether the applicant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Substantial gainful activity is "work activity that involves doing significant physical or mental activities . . . that the claimant does for pay or profit." 20 C.F.R. § 220.141(a)–(b). If the claimant is engaging in such activities, the claimant is not disabled; if not, the evaluation continues at step two.

At step two, the ALJ considers whether the claimant has a severe and medically determinable impairment or combination of impairments. An impairment or combination of impairments is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not suffer from a severe impairment, the claimant is not disabled; if the claimant does have a severe impairment, the ALJ proceeds to step three.

At step three, the ALJ turns to the Social Security Administration's listing of severe impairments (the "Listing"). 20 C.F.R. § 404.1520(d); s*ee also* 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's alleged impairment meets one of the entries in the Listing, the claimant is disabled. If not, the ALJ moves to step four.

At step four, the ALJ assesses the claimant's residual functional capacity, or RFC, to determine whether the claimant can perform past relevant work. 20 C.F.R. § 404.1520(e). The RCF is a determination of "the most [the claimant] can do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ considers past relevant work to be "work that [the claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long

enough for [the claimant] to learn how do to it."  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform past relevant work, the claimant is not disabled; if the claimant is not able to perform such past relevant work, the ALJ continues to step five.

At the fifth step, the burden shifts from the claimant to the Commissioner to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner is able to identify such work, then the claimant is not disabled; if not, the claimant is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

## 2.  Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the Commissioner must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to the following functional areas: 1) understand, remember, or apply information; 2)  interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.   20 C.F.R. § 404.1520a(b)(2), (c)(3).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520a(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "paragraph B" severity criteria in common (and some have alternative "paragraph C" severity criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Therefore, any medically

determinable mental impairment—that is, one that satisfies the paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." *Id.* at 12.00(A)(2)(b). A claimant has a "marked" limitation if the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above. Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."). If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3). This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . . " Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### J. The ALJ's Decision

After considering the evidence, the ALJ found V.W. not disabled as of the amended onset date of June 28, 2017. AR at 15. At step one, he found that V.W. had not engaged in substantial gainful activity since that date. *Id.* At step two, he found that while V.W.'s anxiety and PTSD were severe impairments that limited her ability to work, her hepatitis C and polysubstance abuse were not. *Id.* at 17–18.

At step three, the ALJ found that V.W. did not have an impairment or combination of impairments that met or equaled a listing, specifically considering Listings 12.06 (anxiety and obsessive compulsive disorders) and 12.15 (trauma- and stressor-related disorders). *Id.* In making

this determination, the ALJ addressed whether the paragraph B criteria of these listings were met. *Id*. The ALJ found that V.W. had moderate limitations in all four of the functional categories of paragraph B, namely, understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id*.

In finding V.W. was moderately limited in understanding, remembering, or applying information, the ALJ acknowledged that V.W. had been hit in the head by one of her abusers, that she needs to be reminded to take her medication, and her testimony at the hearing that she had forgotten her ID three times. *Id*. at 18 (citing *id*. at 208, 210). However, he noted that she was "able to schedule and keep her doctor appointments with various medical providers." *Id*.

In finding that V.W. had moderate limitations in interacting with others, the ALJ described V.W.'s "isolative and paranoid behavior," including her concerns about her roommates' "witchcraft," trying to avoid "everyone," and "being fearful and having panic attacks in social situations." *Id*. (citing *id*. at 287, 622). However, he also found that she was able to take public transportation, that she lived with a roommate at the homeless shelter and worked as a "shadow peer" at Santa Cruz Mental Health. *Id*. (citing *id*. at 348, Hearing Testimony). He noted that her therapist described her as "cooperative, conversational, and maintains good eye contact," and that "she was noted to be getting along better with smaller groups and peers." *Id*. (citing AR at 507, 390).

In finding that V.W. had moderate limitations in concentrating, persisting, or maintaining pace, the ALJ weighed V.W.'s reports of her "inability to focus and difficulty concentrating due to her anxiety and panic attacks," (AR at 352), against her reported linear and goal-oriented thought process and her ability to manage her sobriety (AR at 287, 333–34 , 343, 265, 245, 390])." *Id*. at 19.

Finally, in finding that V.W. had moderate limitations in adapting or managing herself, the ALJ noted that V.W. was "homeless and reluctant to pursue mental health treatment." *Id*. (citing AR at 369)   He also acknowledged V.W.'s fear of authority figures and anger problems. *Id*. (citing AR at 509). However, he noted that once V.W. began living at the shelter and taking her medications, "she began sleeping better and her panic attacks decreased" and she became "more

optimistic" and began "planning for her future." *Id.* (citing AR at 369, 373).

The ALJ concluded that V.W. did not meet the paragraph B criteria because she did not have two marked limitations or one extreme limitation in the functional categories discussed above. *Id.* He further found that she did not meet any of the paragraph C criteria "because there is no evidence that the claimant has only minimal capacity to adapt to changes in her environment or demands that are not already part of her daily life." *Id.* at 19.

At step four, the ALJ found that V.W. had the residual functional capacity to perform "a full range of work at all exertional levels but with the following nonexertional limitations: simple repetitive tasks characteristic of unskilled work, with no public contact and only occasional contact with coworkers and supervisors." *Id.* In reaching this RFC, the ALJ found that V.W.'s medically determinable impairments could reasonably cause the symptoms she alleged but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.*

First, the ALJ found that V.W.'s "descriptions and statements to her medical providers, along with her medical providers' examinations show that her physiological symptoms are not as serious or limiting as she has alleged." *Id.* He pointed to her mental status exams, which he described as "generally within normal limits," *id.*, a treatment note observing that she was "getting along better with smaller groups and peers," *id.* (citing *id.* at 507), and reports that "her thought processes were linear and goal oriented, with no suicidal or homicidal ideation," *id.* at 21. He also found that "the claimant's wide-ranging acknowledged daily activities are not consistent with her alleged limitations," such as eating healthily, exercising on her bike, going to church and AA meetings, using public transportation, and shopping in stores. *Id.* (citing *id.* at 211, 511). "Finally," the ALJ added, "the claimant has responded well to treatment" as evidenced by her improved ability to be around small groups of peers, improved mood, self-care, sobriety, and optimism about the future. *Id.* (citing AR at 390).

The ALJ explained that he gave "significant" weight to the opinions of the doctors who reviewed the records, Dr. Meenakshi and Dr. Schwartz but gave "little to no weight" to the opinions of Dr. Wilkie because he found that they were inconsistent with "the longitudinal review

of the medical evidence and other evidence of record." *Id*. at 22. He stated that he considered the opinions of Veronica Whiteley regarding V.W.'s limitations and found that they were consistent with his RFC; to the extent her opinions suggests more severe limitations, he gave her opinions "little weight," noting that Whiteley is not an "acceptable medical source" and she has a "close personal and family relationship with" V.W. *Id*.

At step five, the ALJ relied on the testimony of the VE to find that V.W. could work as a janitor, salvage laborer or hand packager, and that these jobs exist in significant number in the national economy. *Id*. at 23. On that basis, he found that V.W. was not disabled.

### K.    Plaintiff's Contentions

In her Motion, V.W. contends the ALJ erred in the following respects:  1) he improperly gave "little weight" to the opinion s of her treating psychologist, Dr. Wilkie, as to the severity of her limitations; 2) he rejected the statements of V.W. and Whiteley about the severity of V.W.'s symptoms without giving clear and convincing reasons for doing so; and 3) he failed to incorporate all of V.W.'s limitations -- even those found by the state agency physicians whose opinions the ALJ said he gave significant weight to -- into her RFC and failed to include these limitations in the hypothetical he posed to the VE.

## III.    ANALYSIS

### A.    Legal Standard Governing Review of the Commissioner's Decisions

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). "This court may set aside a denial of Social Security disability insurance benefits when the [Commissioner's] findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Desrosiers v. Sec'y of Health & Human Servs*., 846 F.2d 573, 575–76 (9th Cir. 1988). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id*., but "less than a preponderance." *Desrosiers*, 846 F.2d at 576. Even if the Commissioner's findings are supported by substantial evidence, the

decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### B. Whether the ALJ Erred in Weighing the Medical Evidence

#### 1. Legal Standards Governing Evaluation of Medical Evidence

For claims filed before March 27, 2017, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). However, the regulations regarding evaluation of medical evidence have been amended and several of the prior Social Security Rulings, including SSR 96-2p ("Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions"), have been rescinded for claims protectively filed after March 27, 2017, as is the case here. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c (a), 416.920c(a).

The new regulations provide that the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Instead the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following factors: 1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) "other factors." 20 C.F.R. § 416.920c(a)–(c). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that "form the foundation of the current treating source rule." Revisions to Rules, 82 Fed. Reg. 5844-01at 5853.

With respect to "supportability," the new regulations provide that "[t]he more relevant the

objective medical evidence and supporting explanations presented by a medical source are to

support his or her medical opinion(s) or prior administrative medical finding(s), the more

persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §

416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent

a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s)

or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

In evaluating how the "relationship with the claimant" affects the weight that should be

given to medical opinions, the regulations instruct that the following factors should be considered:

> (i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).
>
> (ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).
>
> (iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).
>
> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).
>
> (v) Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

20 C.F.R. § 404.1520c(c)(3)(i)-(v).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific

medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how

[he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical

opinions.'" *Christopher Charles A. v. Comm'r of Soc. Sec.*, No. C19-5914-MLP, 2020 WL

916181, at *2 (W.D. Wash. Feb. 26, 2020) (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1),

416.920c(a) and (b) (1)). Further, the ALJ is required to specifically address the two most

important factors, supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2) (providing that because supportability and consistency are the most important factors, the Social Security Administration "will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision" and further noting that it "may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.").

### 2. Whether the ALJ Erred in Rejecting Dr. Wilkie's Opinions

The ALJ gave "little to no weight" to Dr. Wilkie's opinions about V.W.'s limitations, finding that they were "inconsistent with the longitudinal review of the medical evidence and other evidence of record." AR at 22. The Court finds that the ALJ erred in discounting Dr. Wilkie's opinions because he failed to adhere to the requirements for weighing medical opinions set forth above.

Although the ALJ referred to a "longitudinal review" of the record, he cited only two treatment notes, from August 18, 2017 and September 19, 2017 (AR 507, 511), both by Dr. Krishnan, to support his conclusion that Dr. Wilkie's opinions were inconsistent with the medical record. In particular, he stated:

> [W]hile compliant with her medication regimen and therapy, the claimant was noted to be alert, calm, cooperative, and getting along better with smaller groups of people. [AR 507] In addition her thought processes were linear and goal oriented, she demonstrated no psychomotor agitation, and she denied any paranoia, suicidal or homicidal thoughts. [AR 507, 511].

AR 22.

As preliminary matter, the ALJ mischaracterizes the notes that he cites. In particular, in the note dated September 19, 2017, Dr. Krishnan conveyed a considerably less rosy picture than the ALJ describes, noting that V.W. reported "trembling for the past three days" and that she had "been under stress." AR 511. He noted that V.W. "[i]dentifie[d] this as related to people coming and going at River St shelter. . . . States she feels worried that she will be kicked out. Reports is

socially anxious." *Id*. at 511.

Further, the ALJ fails to address treatment notes by Dr. Wilkie and other treatment providers both before and after this brief period -- and even during the same period -- reflecting more severe symptoms.   Between May 10 and August 18, 2017, V.W. reported sleeping between four and five hours per night. AR at 483 (May 12, 2017 treatment note by Dr. Wilkie).  She continued to have panic attacks.  *Id*. at 478 (May 10, 2017 treatment note by Dr. Kelley stating, "She is anxious a lot and has panic attacks at time[s]"), 483 (May 12, 2017 treatment note by Dr. Wilkie stating, "gets panic attacks and stays inside or walks in circles.  She sweats and her heart beats fast."), 486 (May 23, 2017 treatment note by Dr. Krishnan stating, "Reports 5 to 6 panic attacks in the last week").   She continued to experience significant anxiety.  *Id*. at 486 (May 23, 2017 treatment note by Dr. Krishnan stating, "Anxiety 5/10 (10 worst)"),  502 (May 20, 2017 treatment note by Dr. Wilkie noting "[a] great deal of anxiety"), 504 (August 2, 2017 treatment note by Dr. Kelley stating, "she is struggling with her anxiety and at night has difficulties sleeping).   She consistently reported that she was wary of people and sought to isolate herself from them.  *See id*. at 483 (May 12, 2017 treatment note by Dr. Wilkie stating, "Isolative; walks 'constantly trying to stay away from everyone.'"), 486 (May 23, 2017 treatment note by Dr. Krishnan stating , "Does not feel like being around other people"), 488 (May 30, 2017 treatment note by Dr. Wilkie stating, "fears of trusting almost anyone around her"), 502 (May 20, 2017 treatment note by Dr. Wilkie stating, "Mainly being around people is stressful. . . . Feels people are going to take advantage of her.").   She also had episodes of mistrustful and suspicious behavior. *See id*. at 488 (May 30, 2017 treatment note by Dr. Wilkie describing V.W.'s suspicion that hepatitis C medication was being withheld from her), 500 (June 27, 2017 treatment note by Dr. Krishnan noting that V.W. felt "threatened" by "witchcraft from her roommates").

Similarly, the medical records reflect that after the September 19, 2017 appointment, V.W. experienced significant symptoms that the ALJ did not address.  In a June 21, 2018 treatment note, Dr. Krishnan noted that V.W. described herself as "bewitched and a goddess" and exhibited "[q]uasi psychotic thought process and mood lability."  *Id*. at 618.  During this period, Dr. Krishnan and Dr. Willkie both noted V.W.'s rapid, almost manic speech.  *See id*. at 618 (June 28, 2018 treatment note by Dr. Krishnan describing V.W.'s speech as "rapid, interruptible"), 620 (June 15, 2018 treatment note

by Dr. Wilkie describing V.W. as "Hypomanic/hyper verbal"). V.W. also reported to her doctors that she still felt anxious and experienced PTSD triggers. *See id.* at 620 (June 15, 2018 treatment note by Dr. Wilkie stating, "She complains of feeling triggered by the behaviors of other residents and perceived instability in management . . . . anxious mood and congruent affect."); 622 (May 21, 2018 treatment note by Dr. Krishnan stating, "PTSD is easily triggered. . . . Anxiety level continues to be 7/10."); 626 (May 28, 2018 treatment note by Dr. Wilkie stating, "reports being very anxious"). Her sleep disturbances also continued. *See id.* at 622 (May 21, 2018 treatment note by Dr. Krishnan noting "poor sleep" and that V.W. was "[s]leeping 3 hours max."); 628 (May 19, 2018 treatment note by Dr. Krishnan stating, "Sleep is poor, which she attributes to missing Lexapro and hydroxyzine.").

V.W.'s suspicious behavior and distrust of others also continued. For example, on May 18, 2018, V.W. told Dr. Willkie "she tends to stay up most of the night watching outside or checking doors and locks 'because the homeless are right outside on the other side of the wall, and I have to check that people inside are safe.'" *Id.* at 624. V.W. told Dr. Krishnan that she was "fearful that people are vindictive. She states there are a lot of haters and jealousy. She spends time alone." *Id.* at 628.

Finally, even at an appointment on September 6, 2017 – *between* the two appointments cited by the ALJ – V.W. reported more severe symptoms. In particular, treatment notes by Dr. Wilkie from that date reflect that V.W. was "very restless/agitated" and that she was being "trigger[ed]" by her roommate and had been told by shelter staff to "develop some boundaries." AR 509. The note also observes that V.W. was angered by a metro security guard who had made a pass at her and that she was "frequently triggered by authority/uniforms (police, guards)." *Id.*

The ALJ erred by selectively relying on isolated treatment notes without addressing the whole record to find that Dr. Wilkie's opinions regarding the severity of V.W.'s limitations were inconsistent with the record. *See Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) (holding that the ALJ "must interpret reports of improvement . . . with an understanding of the patient's overall well-being and the nature of her symptoms."); *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common

occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."); *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001)(holding that the ALJ's "specific reason for rejecting [a treating physician's medical opinion [was] not supported by substantial evidence" by "selectively rel[ying] on some entries in [the claimant's] records . . . and ignor[ing] the many others that indicated continued, severe impairment.").

    The ALJ's error was compounded by the fact that he gave "significant weight" to the opinions of state agency doctors who neither examined nor treated V.W.  While the new regulations have abandoned the "controlling weight" rule, the treatment relationship with the claimant continues to be a factor that must be considered in determining the weight to be given medical opinions.  *See* 20 C.F.R. § 404.1520c(c)(3).  In contrast to Dr. Wilkie, these doctors had no treatment relationship with V.W. and moreover, their opinions were based only on medical records that were submitted before November 2017.   In contrast, Dr. Wilkie's second  Behavioral Health Report was completed in June 2018.

    Therefore, the Court finds that the ALJ erred in rejecting the opinions of Dr. Wilkie with respect to V.W.'s impairments and that his decision to give little weight to those opinions is not supported by substantial evidence.

**C.**    **Whether the ALJ Gave Clear and Convincing Reasons for Rejecting V.W.'s Subjective Symptom Testimony**

**1.**    **Legal Standards Governing Credibility Determinations**

    "The ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).  In assessing credibility, the ALJ must first determine "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  Then, if there is no evidence of malingering, "the ALJ can reject the

claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 128. These reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (internal quotation marks omitted).

### 2. Application of Legal Standards

The ALJ gave three reasons to support his finding that V.W.'s testimony about her subjective symptoms was not credible: 1) her mental status exams were "generally within normal limits;" 2) her reported daily activities were inconsistent with her testimony; and 3) she improved with treatment and medication. AR at 20–21. These reasons are not clear and convincing and are not supported by substantial evidence in the record.

#### a. Mental Status Exams

In support of his conclusion that V.W.'s mental status exams were "generally within normal limits," the ALJ relied on the same two treatment notes discussed above, namely Dr. Krishnan's August 18, 2017 and September 19, 2017 treatment notes (AR 507, 511). For the same reasons the Court found that the ALJ's reliance on these notes to discount the opinions of Dr. Wilkie were not supported by substantial evidence, it finds that these two isolated notes do not provide a clear and convincing reason supported by substantial evidence for rejecting V.W.'s testimony about her symptoms.

#### b. Daily Activities

An ALJ may use a claimant's reported activities to determine whether a claimant's testimony about the severity of their symptoms is credible. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). The Ninth Circuit has recognized, however, that "[t]he mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1049–50 (9th Cir. 2001) (quoting *Fair v. Bowen*, 885 F.2d at 603). Rather, in order for a claimant's daily activities to provide a sufficient basis for discrediting the claimant's

testimony about the severity of their symptoms, the claimant must be "able to spend a substantial part of [their] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Fair v. Bowen*, 885 F.2d at 603.

Here, the ALJ found:

> [V.W.'s] wide-ranging acknowledged daily activities are not consistent with her alleged limitations. For example, she was noted to be eating healthier, riding her bike, attending AA meetings on a daily basis, and attending church on a regular basis. [AR at 511]. In fact, despite her anxiety, she is able to use public transportation (i.e., metro bus). [*Id.* at 211]. She also reports being able to shop in stores for food and clothing. [*Id.*]

AR at 21. Yet the ALJ fails to address how these activities contradict V.W.'s testimony or reflect transferrable skills that V.W. could perform for a substantial part of the work day. Therefore, the Court finds that these activities do not provide a clear and convincing reason supported by substantial evidence for discrediting V.W.'s testimony. *See Vertigan v. Halter*, 260 F.3d 1 at 1050 (noting that the Ninth Circuit has repeatedly held that "the mere fact that a [claimant] has carried on certain daily activities, such as grocery shopping" does not provide substantial evidence for discrediting the claimant's testimony about their symptoms); *Thommen v. Colvin*, No. 3:12-CV-01625-SI, 2013 WL 5819099, at *9 (D. Or. Oct. 29, 2013) (holding that the plaintiff's daily activities of watching television, visiting family and friends, shopping weekly, driving, going to movies with his son, doing yard work and attending AA meetings was not substantial evidence that supported discounting plaintiff's testimony).

### c. Improvement with Treatment

Finally, the ALJ's contention that V.W.'s improvement with medication and treatment is not a convincing reason. The only evidence the ALJ cites in support of this finding is Dr. Krishnan's August 18, 2018 treatment noted, discussed above. AR 390, 511.[6] As discussed above, this isolated treatment note is not representative of the record as a whole and the ALJ has failed to address why the somewhat diminished severity of some of V.W.'s symptoms on that day was not merely because "symptoms wax and wane in the course of treatment." *Garrison*, 759

---

[6] These pages of the AR are duplicates. Both contain Dr. Krishnan's treatment notes from V.W.'s August 18, 2017 visit.

F.3d at 1017–18. Accordingly, the Court finds that this also is not a clear and convincing reason supported by substantial evidence for discrediting V.W.'s statements about her symptoms.

### D. Whether the ALJ Gave Adequate Reasons for Discrediting Statements of Veronica Whiteley

#### 1. Legal Standards

"[T]he ALJ may expressly disregard lay testimony if the ALJ 'gives reasons germane to each witness for doing so.'" *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001)). "When an ALJ fails to provide reasons for rejecting competent lay testimony and the district court determines the error was not harmless, the Commissioner's findings lack substantial evidence." *Stephens v. Colvin*, No. 13-CV-05156-RS, 2014 WL 6982680, at *7 (N.D. Cal. Dec. 9, 2014) (citing *Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1053 (9th Cir.2006)). "The reviewing court may not consider the error harmless 'unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.'" *Id.* (quoting *Stout*, 454 F.3d at 1056).

#### 2. Application of Legal Standards

The ALJ rejected Whiteley's testimony to the extent that it supported limitations greater than those outlined in his RFC for three reasons:  1) "Whiteley is not an acceptable medical source;" 2)  Whiteley had a  "close personal and family relationship" with V.W.; and 3)  Whiteley's opinion was "less well supported by the objective medical evidence present in the record . . . than the well supported medical opinions outlined above."  AR at 22.  None of these reasons is sufficient.

First, to the extent the ALJ discounted Whiteley's statements because she was not an "acceptable medical source," the ALJ misunderstood the role of lay testimony in the disability determination.   While "medical diagnoses are beyond the competence of lay witnesses and therefore do not constitute competent evidence, . . . lay testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996);  *see also Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (holding that a "lay person . . . though not a vocational or medical expert, was not disqualified

from rendering an opinion as to how [the claimant's] condition affects [her] ability to perform basic work activities.") (citing 20 C.F.R. § 404.1513(d)(4)). Whiteley did not purport to offer a medical diagnosis; rather, she described V.W.'s symptoms, including her difficulty focusing, her constant elevated mood, her being in "do mode" all the time, and her tendency to become overwhelmed when around other people. These observations are competent evidence and the ALJ erred in declining to credit them on the basis that Whiteley is not a medical source.

The second reason offered by the ALJ for rejecting Whiteley's statements also is not "germane." The Ninth Circuit has held, as a matter of law, that a personal relationship with the claimant is not a sufficient reason for rejecting testimony of a lay witness. *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017). As the court in *Diedrich* explained, "[t]o do so 'contradicts our insistence that, regardless of whether they are interested parties, friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to his or her condition.'" *Id.* (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (internal quotation marks omitted) and citing *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996) ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony. To the contrary, testimony from lay witnesses who see the claimant every day is of particular value; such lay witnesses will often be family members." (citation omitted)). Here, it is apparent that Whiteley was in a unique position to observe V.W.'s symptoms as she lived in the shelter with her. Thus, her relationship with V.W. was not an adequate reason to reject Whiteley's statements.

Finally, the ALJ erred in discrediting Whiteley's statements on the basis that they were "less well supported by the medical record" than were the opinions of some of the medical sources. As the Ninth Circuit explained in *Dierdrich*, "a lack of support from the 'overall medical evidence' is also not a proper basis for disregarding" a lay witness's testimony because "[t]he fact that lay testimony and third-party function reports may offer a different perspective than medical records alone is precisely why such evidence is valuable at a hearing." *Id.* (citing *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) ("Nor under our law could the ALJ discredit [the witness's] lay testimony as not supported by medical evidence in the record.")).

1      The Court also finds that the ALJ's errors were not harmless as Whiteley described

2  symptoms that were not reflected in V.W.'s RFC, discussed further below.

3

4      **E.     Whether the RFC and Resulting Hypothetical Adequately Reflected V.W.'s
            Limitations**

5      V.W. argues that the ALJ erred in adopting an RFC that found V.W. capable of "a full

6  range of work at all exertional levels but with the following nonexertional limitations:  simple

7  repetitive tasks characteristic of unskilled work, with no public contact and only occasional

8  contact with coworkers and supervisors."  She asserts that the moderate limitations in all four

9  paragraph B areas of daily living found by the state agency doctors who reviewed the record–

10 whose opinions the ALJ purportedly gave significant weight to – are not reflected in this RFC and

11 that the significant limitations found by V.W.'s examining and treating doctors also are not

12 adequately reflected in the ALJ's RFC.   The Court agrees.   In particular, it finds that the ALJ did

13 not incorporate into his RFC V.W.'s limitations with respect to concentrating, persisting and

14 maintaining pace.

15     "[A]n ALJ's assessment of a claimant adequately captures restrictions related to

16 concentration, persistence, or pace where the assessment is consistent with restrictions identified

17 in the medical testimony."  *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008)

18 (citing *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001); *Smith v. Halter*, 307 F.3d 377,

19 379 (6th Cir. 2001)).  Here, treating and examining doctors found significant limitations in this

20 area, and the reviewing state agency doctors agreed, yet the ALJ included no limitations in V.W.'s

21 RFC addressing these functional limitations except a limitation to simple, repetitive tasks.  This

22 limitation does not take into account the extensive (and uncontradicted) evidence in the record of

23 V.W.'s mood lability, anxiety, panic attacks, and tendency to be easily triggered.  The Court

24 therefore finds that ALJ erred in adopting this RFC and that because he relied on VE testimony

25 that incorporated this RFC, his finding of nondisability at step five is not supported by substantial

26 evidence.  *See Linda O.D.G. v. Berryhill*, No. CV 17-07170-AFM, 2018 WL 6308105, at *6 (C.D.

27 Cal. Nov. 30, 2018) ("[N]umerous courts . . . have found reversible error where an ALJ finds that

28 a claimant has moderate limitation in maintaining concentration, persistence, or pace, but purports

to account for that limitation in the RFC only by limiting the claimant to simple, repetitive, or unskilled work.") (listing cases); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006) ("[I]n hypotheticals posed to a vocational expert, the ALJ must only include those limitations supported by substantial evidence. . . . Conversely, an ALJ is not free to disregard properly supported limitations.") (citing *Osenbrock v. Apfel*, 240 F.3d 1157, 1163–65 (9th Cir. 2001)).

### F. Remedy

"A district court may to affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014) (quoting 42 U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). Here, the Court finds that further proceedings are necessary to address the ALJ's errors with regard to his weighing of the medical evidence, consideration of the testimony of V.W. and Whiteley, and evaluations of V.W.'s RFC. On remand, the Commissioner should reevaluate V.W.'s functional limitations under proper standards and consider whether V.W. is disabled under a listing; if V.W. is not disabled under a listing, the Commissioner should revisit her RFC and obtain additional VE testimony to address what work, if any, V.W. may be able to perform in light of an RFC that is free of legal error and supported by substantial evidence.

## IV. CONCLUSION

For the reasons discussed above, V.W.'s motion is GRANTED, the Commissioner's motion is DENIED and the matter is REMANDED to the Commissioner for further proceedings consistent with this order. The Clerk is instructed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

Dated: March 30, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

Northern District of California / United States District Court (margin text)